UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------X
VIRGINIA IANNIELLO,

                    Plaintiff,

        -against-

HARTFORD LIFE AND ACCIDENT INSURANCE
COMPANY; GROUP LONG TERM DISABILITY
PLAN FOR EMPLOYEES OF AMERICAN
INTERNATIONAL GROUP, INC.,

                    Defendant.
--------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
CV 10-370 (SJF)(ARL)

**LINDSAY, Magistrate Judge:**

      Before the court, on referral from District Judge Feuerstein, are the parties' cross-motions

for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the

reasons set below, the court recommends that the defendant's motion be granted and the

plaintiff's motion be denied.

## BACKGROUND

      The plaintiff, Virginia Ianniello ("Ianniello"), commenced this action on January 28,

2010, pursuant to the Employees Retirement Security Act of 1974, 29 U.S.C. §§ 1001, et seq.,

seeking to recover long term disability benefits under a group long term disability plan offered by

her former employer, American International Group, Inc. ("AIG"), and issued by the defendant

Hartford Life and Accident Insurance Company ("Hartford"). Ianniello began working for AIG

in 1981. Def. 56.1 Stmt. ¶ 1.[1] In 2004, Ianniello filed a claim for long term disability benefits

---

[1]The facts set forth in this report are taken from the uncontested facts set forth in either
the defendant's or the plaintiff's Rule 56.1 statements and from the Administrative Record
("AR"). The court notes that the plaintiff restated her Rule 56.1 statement as "additional
disputed facts in her counter-statement but the court will only cite to her Rule 56.1 Statement.
The court also notes that the defendant has objected to almost every statement offered by the

with another carrier and was granted benefits until September 26, 2006.  Def. 56.1 Stmt. ¶¶ 2, 3; AR 84.  On September 26, 2006, Ianniello was deemed to be functionally able to work, but AIG terminated her because they did not have a position available.  Def. 56.1 Stmt. ¶ 4; AR 84.  On January 1, 2007, Ianniello was rehired by AIG Travel, Inc., as a Manager of Multi-National Accounts.  Def. 56.1 Stmt. ¶¶ 6, 7; AR 121, 1261.

On December 12, 2007, Ianniello filed a claim for short term disability benefits, stating that she had become disabled on December 5, 2007 due to vertigo, dizziness and nausea.  Def. 56.1 Stmt. ¶ 19; AR 79.  Hartford approved the claim and paid Ianniello benefits through June 3, 2008.  Def. 56.1 Stmt. ¶ 48; AR 131, 133.  Ianniello then filed a claim for long term disability benefits, which was initially treated as a claim covered under the pre-existing condition exclusion.  Def. 56.1 Stmt. ¶ 49; AR 116-18, 120-21, 1216.  On August 29, 2008, Ianniello's claim for long term benefits was denied due to her failure to submit proof of loss required for a pre-existing condition review.  Def. 56.1 Stmt. ¶ 49; AR 116-18, 120-21, 1214-16.  However, shortly thereafter, Hartford determined that the pre-existing exclusion did not apply to Ianniello because she had been rehired by AIG within six months of her termination and they began to review the claim.  Def. 56.1 Stmt. ¶ 51-55; AR 118.  On January 2, 2009, Hartford then denied Ianniello's claim.  Def. 56.1 Stmt. ¶ 276; AR 95.

On June 26, 2009, Ianniello appealed Hartford's denial.  Def. 56.1 Stmt. ¶ 289; AR 89, 2525-3131.  Then, on November 2, 2009, Hartford affirmed its decision.  Def. 56.1 Stmt. ¶ 371; AR 278.  The instant lawsuit was filed twelve weeks later.

---

plaintiff on the grounds that it is "convoluted, unintelligible, and not a material fact."  The court did not find the plaintiff's statements to be unintelligible or convoluted and has, where relied upon, compared the statements to the record to confirm their accuracy.

Ianniello last worked at AIG on December 4, 2007.  Def. 56.1 Stmt. ¶ 12; AR 47-48.

## A.  The Policy

Under AIG's long term disability plan, an employee becomes eligible for long term disability benefits after he or she has completed a waiting period of 30 days of continuous service.  AR 19.  Benefits are payable at the end of an "elimination period" defined as the last to be satisfied of either the first 182 consecutive days of any one period of disability" or the expiration of any employer sponsored short term disability or salary continuation plan, with the exception of benefits required by law.  Def. 56.1 Stmt. ¶ 13; AR 19.  An employee is considered "disabled" if:

> 1.  during the Elimination Period, [he or she is] prevented from performing one or more of the Essential Duties of [his or her] Occupation."
>
> 2.  for the 24 months following the elimination period, [he or she is] prevented from performing one or more of the Essential Duties of [his or her] Occupation, and as a result [his or her] current Monthly Earnings are less than 80% of [his or her] Indexed Pre-disability Earnings;
>
> 3.  After, that you are prevented from performing one or more of the Essential Duties of Any Occupation.[2]

Def. 56.1 Stmt. ¶ 14;  AR 34.  If, at the end of the elimination period, an employee is still prevented from performing one or more essential duties of his or her occupation, but has monthly earnings greater than 80%, the elimination period is extended for 12 months from the original date of the disability or until such time as current monthly earning are less than 80% of an

---

[2]Essential duty is defined as a duty that is substantial, not incidental; is fundamental or inherent to the occupation, and can not be reasonably omitted or changed.  Def. 56.1 Stmt. ¶ 15; AR 35.

employee's pre-disability earnings.  Def. 56.1 Stmt. ¶ 14; AR 34.  In addition, the disability must

be the result of (1) accidental bodily injury; (2) sickness; (3) mental illness; (4) substance abuse;

or (5) pregnancy.  *Id.*

Finally, under AIG's plan, Hartford has the authority to determine a claimant's eligibility

for benefits.  Specifically, the plan provides:

> We[3] have the full discretion and authority to determine eligibility
> for benefits and to construe and interpret all terms and provisions
> of the Group Insurance Policy.

Def. 56.1 Stmt. ¶ 17; AR 33.

## B.  Ianniello's Job with AIG Travel, Inc.

As previously stated, from sometime in 2004 to September 26, 2006, Ianniello collected

long term disability benefits from another carrier.  On January 1, 2007, three months after

Ianniello was deemed functionally able to return to work, she was rehired by AIG as a Manager

of Multi-National Accounts.  Def. 56.1 Stmt. ¶¶ 6, 7; AR 1261, 1141-42.  Ianniello contends that

her written job description provided to her by AIG specified:

> Serves as central point of contact (internal/external) for online and
> offline travel industry distributers of travel insurance product;
> coordinates the development and implementation of travel
> insurance and emergency assistance services programs for multi-
> national clients.

Pl. 56.1 Stmt. ¶ 8; AR 475; Def. 56.1 Ctr. ¶ 8.  Ianniello further contends that the following

qualifications were required for her job:

> Bachelor's degree in a business discipline or equivalent work
> experience; general travel industry knowledge is required . . .
> Should possess sound organizational and planning skills; excellent

---

[3]The plan defines "We" as the Hartford Life and Accident Insurance Company.  AR 37.

verbal communication skills; keen analytical skills; and the ability to make sound business decisions. Should be multi-tasks oriented and have demonstrated the ability to work well with others in a fast-paced time-sensitive environment . . . . Should display the drive and determination required to achieve business objectives and effectively manage change.  Must be willing and able to travel extensively; both domestic and international.  Must be performing satisfactory in his or her present position.

Pl. 56.1 Stmt. ¶ 9; AR 476.  Hartford argues that the job description is inaccurate. *See, infra*.

## C.  Ianniello's Medical Condition and Initial Claim for Short-Term Disability Benefits

On December 4, 2007, twelve months after Ianniello had returned to work after her earlier two year disability leave, Ianniello was seen by Dr. Sunah Oh, an internist, who indicated in his progress report that Ianniello had complained she was suffering from fibromyalgia, could not do much, was fatigued, feeling lousy, in chronic pain, saw the room spinning and had chills.  Pl. 56.1 Stmt. ¶ 13-14; AR 508-09, 1294-95.  Dr. Oh indicated in his notes that he suspected "BPPV" (benign paroxysmal positional vertigo).  *Id.*  On December 12, 2007, Ianniello filed a claim for short term disability stating that she was disabled as of December 5, 2007, due to vertigo, dizziness and nausea.  Def. 56.1 Stmt. ¶ 19; AR 79.  In connection with her application, Ianniello submitted a letter from Dr. Oh dated December 19, 2007, that indicated that Ianniello suffered from "vertigo and dizziness secondary to nausea."  Def. 56.1 Stmt. ¶ 21; AR 1318.  Dr. Oh concluded that Ianniello could not sit, stand or walk for any portion of the work day.  Def. 56.1 Stmt. ¶ 22; AR 1319.

On January 7, 2008, Dr. Oh prepared another APS (attending physician statement), which noted "Patient is not able to work at this time or to travel to work."  Pl. 56.1 Stmt. ¶ 15; AR 526, 120.5.  Hartford denies that those were Dr. Oh's findings.   Def. 56.1 Ctr. Stmt. ¶ 15; AR 526,

1202-03, 1205.  Four day later, on January 11, 2008, Dr. Oh prepared another APS, in which he indicated that Ianniello again complained of dizziness.  Def. 56.1 Stmt. ¶ 24; AR 1310.  Dr. Oh diagnosed Ianniello with "vertigo secondary to nausea." and concluded that she could not sit, stand or walk for any portion of the work day."  Def. 56.1 Stmt. ¶¶ 23, 25; AR 1310-11.  Dr. Oh indicated that Ianniello would be able to return to work on January 21, 2008, and that her restrictions and limitations would only persist for two weeks.  Def. 56.1 Stmt. ¶ 26; AR 1311.

On January 31, 2008, Ianniello submitted another APS from Dr. Oh to reflect her continued disability.  Def. 56.1 Stmt. ¶ 27; AR 1308.  Ianniello had been taken to the ER by ambulance on January 25th for dizziness, inability to ambulate, and intractable vertigo.  Pl. 56.1 Stmt. ¶ 16; AR 769-802.  Dr. Oh diagnosed Ianniello with vertigo and anxiety and concluded that she was unable to use public transportation or to return to work with or without limitations.  Def. 56.1 Stmt. ¶ 28-30; AR 1308.  Dr. Oh stated that Ianniello would be able to return to work on February 11, 2008.  *Id.*

On February 5, 2008, Ianniello then saw Dr. Carl Anderson, board certified in internal medicine, who noted that Ianniello had complained that she fainted in the shower, had no energy, had vertigo, was weak and fatigued, had dyspnea and wheezing.  Pl. 56.1 Stmt. ¶ 17; AR 489, 491, 909, 1281, 2611; Def. 56.1 Stmt. ¶¶ 165-66; AR 1275.  Ianniello underwent an EKG and Cardiac Doppler, which were both normal.  Def. 56.1 Stmt. ¶ 169; AR 919.  Dr. Anderson concluded that Ianniello had fatigue, adrenal syncope, vertigo CAD, and hypertension.  Def. 56.1 Stmt. ¶ 167; AR 1275.  Ianniello also saw Dr. Anderson on February 14, 2008, and he listed a history of fatigue, dyspnea (shortness of breath), weakness, and chest discomfort.  Pl. 56.1 Stmt. ¶ 18; AR 494, 1280, 2609; Def. Ctr. 56.1 Stmt. ¶ 18.  On February 29, 2009, Ianniello returned to Dr. Anderson, who reported that Ianniello complained of fatigue, fibromyalgia, myalgias,

dyspnea in exertion, tremors, weight loss and back pain. Pl. 56.1 Stmt. ¶ 19; AR 489, 493, 922, 1279, 2607; Def. 56.1 Stmt. ¶ 171; AR 1275. Ianniello's blood work was in normal limits and Dr. Anderson's impression was that she was suffering from dyspnea, fatigue, B12 Deficiency and fibromyalgia. Def. 56.1 Stmt. ¶¶ 172-73; AR 1275. That same day, Dr. Anderson submitted an APS to Hartford, in which he reported Ianniello's complaints and his diagnosis of fibromyalgia secondary to hyperthyroidism. Def. 56.1 Stmt. ¶¶ 32-34; AR 1302. Dr. Anderson reported that Ianniello was able to function normally at home, but could not work more than two hours. Def. 56.1 Stmt. ¶ 36; AR 1302; Pl. 56.1 Stmt. ¶ 20; AR 2738. Dr. Anderson did not suggest a return work date. Def. 56.1 Stmt. ¶ 37; AR 1302.

On March 11, 2008, Ianniello returned to Dr. Anderson and reported that she was shaking and had fatigue, dizziness, and dyspnea. Pl. 56.1 Stmt. ¶ 21; AR 492, 923, 1278, 2605. Dr. Anderson found her blood work to be in normal limits, reported his findings as dizziness, peptic ulcer and B12 deficiency, prescribed Nexium and Melatonin, and referred Ianniello to Dr. Allen Perel, a neurologist. Def. 56.1 Stmt. ¶¶ 43, 175-77; AR 1271, 1274. When Ianniello saw Dr. Perel, she reported that she had a family history of Parkinson's Disease, but that her symptoms occurred after an episode of dehydration and thyroid abnormalities. Def. 56.1 Stmt. ¶¶ 44, 183; AR 932, 1271. Ianniello also reported that she had undergone a CAT scan and an MRI of her brain and both were noted to be unremarkable. Def. 56.1 Stmt. ¶ 46; AR 932, 1271. Dr. Perel noted his impression as follows:

> Virginia Ianniello is a 53-year-old women with shuffling gait, positive retropulsion, and resting and sustention tremor. I feel the patient's diagnosis is that of Parkinsonism. She appears to have an overlying essential tremor. The differential diagnosis is that of Parkinsonism would include neuroleptic agent. She is presently taking Reglan 5 mg twice a day, although a small dose of this may be contributing to her symptoms and I have recommended that she

> discontinue Reglan to see if her symptoms improve. In addition,
> the patient does have evidence of the sustention tremor, which may
> be on the basis of thyroid disease . . . the possibility of cutting back
> in the thyroid medicine should be considered . . . . In the future,
> the use of medications for Parkinson's disease may be considered
> if her symptoms do not respond to the discontinuation of Reglan.

Pl. 56.1 Stmt. ¶ 22; AR 486. Notwithstanding this finding, Ianniello has admitted that she does

not have Parkinson's Disease. Def. 56.1 Stmt. ¶ 45.

That same day, Ianniello saw Dr. Anderson who decided to alter her thyroid medicine and

add Lyrica, Compozene and B12 injections. Def. 56.1 Stmt. ¶ 180; AR 1274. Two days later,

Ianniello returned to Dr. Anderson, who again reported that Ianniello was complaining of fatigue

and weakness, so he prescribed Lyrica. Pl. 56.1 Stmt. ¶ 23; AR 488, 491, 1277. Dr. Anderson

recorded his impressions as tremors, fatigue, weakness, peptic ulcer and referred to his new

medication plan. Def. 56.1 Stmt. ¶¶ 186-88; AR 1274.

On April 1, 2008, Dr. Anderson submitted a second APS to Hartford in support of

Ianniello's claim for continued short term disability benefits. Def. 56.1 Stmt. ¶ 38; AR 1288.

This time, Dr. Anderson diagnosed Ianniello with hypertension, Parkinson's disease, Fatigue and

Fibromyalgia secondary to hypothyroidism and noted that Ianniello had undergone an EKG, and

ICG, blood work and an echocardiogram. Def. 56.1 Stmt. ¶¶ 39, 41; AR 1288. Dr. Anderson

concluded that Ianniello was disabled for an undetermined period and scheduled her for an

appointment on April 14, 2008. Def. 56.1 Stmt. ¶ 42; AR 1288.[4]

During the same time period, Hartford sent AIG a Physical Demand Analysis Form. Pl.

---

[4]Ianniello saw Dr. Anderson one more time before being approved for short term
disability benefits, at which time Ianniello reported being fatigued and stressed and having
myalgia, fever, chills, dyspnea, chest discomfort, anemia, hyperthyroidism and dizziness. Pl.
56.1 Stmt. ¶ 25; AR 2603.

56.1 Stmt. ¶ 37; AR 65. The form was completed by Peter Kitt, who indicated that Ianniello never drove, reached, handled, fingered or felt, that she occasionally traveled by airplane (1-33%), that she did not push, pull or carry, that she was required to sit for seven hours, to talk and hear in person, on the phone, and in group settings. Pl. 56.1 Stmt. ¶ 38; AR 480-81, 505-06, 1290-92. On May 16, 2008, Hartford noted in a Summary Detail Report that Ianniello had long term disability potential. Pl. 56.1 Stmt. ¶ 39; AR 132. Shortly thereafter, Hartford approved Ianniello's claim for short term benefits through June 3, 2008. Def. 56.1 Stmt. ¶ 48; AR 131, 133.

**D. Ianniello's Continued Medical Treatment and Claim for Long-Term Disability Benefits**

By letter dated May 16, 2008, Hartford advised Ianniello that her short term disability would be exhausted in June and sent her a long term disability benefits form. Def. 56.1 Stmt. ¶ 55; AR 131; Pl. 56.1 Stmt. ¶ 40; AR 179. Three days later, Ianniello was contacted by Amy Cook, Hartford's Ability Analyst, who advised her that her effective date for long term disability benefits would be June 4, 2008. Def. 56.1 Stmt. ¶ 56; AR 131. During their conversation, Ianniello reported that her thyroid wasn't working and that Parkinson's Disease was keeping her out of work. Def. 56.1 Stmt. ¶¶ 57, 58; AR 131. On June 5, 2008, AIG sent Ianniello's Job Description to Hartford. Pl. 56.1 Stmt. ¶ 41; AR 1260-62. AIG indicated that Ianniello was a Manager of Multi-National Accounts and listed nine job responsibilities including, among other things, routinely communicating with local, regional and divisional underwriter; attending and participating in sales presentations, and travel as necessary to accomplish business objectives (current estimate of 50% to include a mix of domestic and international). AR 1262.

On June 21, 2008, Ianniello submitted her claim for long term benefits to Hartford. Def. 56.1 Stmt. ¶ 59; AR 458-62. On the application, Ianniello listed her symptoms as "dizziness,

loss of appetite, exhaustion, hair loss, tremors and pain. Def. 56.1 Stmt. ¶ 60; AR 459. She

further indicated that she had suffered from fibromyalgia for several years, had been unable to

work since December 4, 2007, and stated that the aspect of her condition that made her unable to

work was "dizziness, tremors, exhaustion, and pain." Def. 56.1 Stmt. ¶¶ 61, 62, 64; AR 459-460.

Ianniello listed Dr. Oh, Dr. Anderson, Dr. Goldstein and other doctors at Staten Island Medical

Center as her treating physician. Def. 56.1 Stmt. ¶ 63; AR 458.

As requested, Ianniello also submitted a "History of Work and Education with Pension

Questionnaire" and a "Physical Demand Analysis ("PDA")" Def. 56.1 Stmt. ¶¶ 66, 71; AR 130,

464. In the questionnaire, Ianniello noted that she had a variety of job duties and that her job

required her to lift, stand and travel. Def. 56.1 Stmt. ¶¶ 67-68; AR 464. As was previously

stated, the PDA from AIG indicated that Ianniello never had to drive, balance, stoop, kneel,

crouch, crawl, climb, reach, handle, finger or feel, but that she did have to travel occasionally (1-

33%), and was required to sit for seven hours at one time and talk and hear people. Def. 56.1

Stmt. ¶¶ 77-78; AR 506; Pl. 56.1 Stmt. ¶ 38; AR 480-81, 505-06, 1290-92. In late June, Hartford

confirmed receipt of the long term disability claim and requested medical records from Drs. Oh,

Anderson, Goldstein and Staten Island Medical Center.

In August, Hartford denied Ianniello's claim for long term disability benefits based on her

failure to submit "proof of loss," which was required for its pre-existing condition review. Def.

56.1 Stmt. ¶ 49; AR 464, 1214. Hartford was under the impression that Ianniello had never left

AIG, and thus, believed that the pre-existing condition exclusion applied to Ianniello's claim.

Def. 56.1 Stmt. ¶¶ 50-51; AR 116-121. However, once AIG confirmed that Ianniello had been

terminated on September 26, 2006 and rehired on January 1, 2007, Hartford realized that pre-

existing condition exclusion was no longer applicable and continued its review of her claim.

Def. 56.1 Stmt. ¶¶ 51-54; AR 118.[5]

## E. The Medical Records Provided to Hartford

### 1. Dr. Anderson

On September 16, 2008, Hartford received medical records from Dr. Anderson from February 2003 to November 2008, several of which have already been discussed in connection with Ianniello's application for short-term disability benefits. Def. 56.1 Stmt. ¶ 145; AR 113. In summary, between February 2003 and January 2006, Dr. Anderson performed several pulmonary function tests on Ianniello, apparently due to her complaints of shortness of breath, which revealed a reactive disorder and severe obstruction, but her spirometric results were normal. Def. 56.1 Stmt. ¶¶ 147-150; AR 867-874. However, when Ianniello applied for benefits she did not list dyspnea as either a symptom or a reason she was unable to work. AR 459-60.

Dr. Anderson also ran several hemodynamic[6] studies on Ianniello. Def. 56.1 Stmt. ¶¶ 151-153; AR 881-900. Three out of ten times, Ianniello had slightly abnormal findings. *Id.* In October 2006, Ianniello had a normal EKG. Def. 56.1 Stmt. ¶¶ 154-55; AR 890. In November 2006 and June 2007, Ianniello had a EDG to rule out gastroesophageal reflux disease ("GERD"), the result of which determined that Ianniello had esophogitis, gastritis, hiatial hernia, and a peptic ulcer. Def. 56.1 Stmt. ¶¶ 156-164; AR 904. The biopsies preformed during the tests indicated non-specific chronic inflamation. Def. 56.1 Stmt. ¶¶ 163-64; AR 901-02. Again, Ianniello did

---

[5]Hartford has not offered an explanation for why they sent out the August 28, 2008 termination letter given the fact that they had determined that the pre-existing condition exclusion did not apply six days earlier. AR 118.

[6]Hartford had identified documents 881-900 as blood tests. The lab reports are for hemodynamic studies, which are more accurately tests to measure blood pressure and blood flow.

not refer to any of her gastric conditions in her application for benefits. AR 459-60.

As previously discussed, between February 5, 2008 and April 1, 2008, Ianniello saw Dr. Anderson six times. Def. 56.1 Stmt. ¶¶ 165-188; AR 919, 932 ,1274-75. On April 21, 2008, Ianniello returned to Dr. Anderson complaining of fatigue, but he did not alter his plan of treatment. Def. 56.1 Stmt. ¶¶ 191-92; AR 943. Between May 2008 and November 2008, Ianniello saw Dr. Anderson nine more times. Pl. 56.1 Stmt. ¶¶ 26-36; AR 943-49, 2584-99, 2601; Def. 56.1 Stmt. ¶¶ 193-98. Each time, Dr. Anderson noted Ianniello's complaints including dizziness, fatigue, fever, chills and sweats. *Id.*

Dr. Anderson also prepared two additional APSs; the first was dated June 12, 2008 and second was undated but received before September 2008. The June APS noted that Ianniello had chronic fatigue, secondary to fibromyalgia and hypothyroidism, and that she could not stand for more than 15 minutes and less at work, had problems walking after 20 minutes, could not hold 10 pounds for more that 30 minutes, and could not be on the computer for more that 15 minutes without pain. Def. 56.1 Stmt. ¶¶ 80-81; AR 1253-54. Pl. 56.1 Stmt. ¶ 26; AR 943. The later APS noted that Ianniello had severe fibromyalgia, hypothyroid, fatigue, hypertension, and dehydration, a trigger point-TBP (?), and was able to function normally for an hour but could not work more than two hours.[7] Pl. 56.1 Stmt. ¶ 33; AR 1302.

## 2. <u>Staten Island Hospital</u>

Records received from Staten Island University Hospital reflected that in Ianniello went to the emergency room in April, July and December 2007, and had an outpatient test in June

---

[7]Hartford contends that Dr. Anderson never performed a trigger point test, which is used to diagnose fibromyalgia. Def. 56.1 Stmt. ¶ 199; AR 942. Ianniello contends that Dr. Anderson did perform a trigger point test. Pl. 56.1 Ctr. Stmt. ¶ 199; AR 1288, 2738.

2007. Def. 56.1 Stmt. ¶ 83; AR 554-696. On April 7th, Ianniello complained of difficulty breathing, dizziness, palpitations, anxiety and her heart racing. Def. 56.1 Stmt. ¶¶ 84-85; AR 556-58. Ianniello reported that she had a pre-existing left ear infection, had been previously treated for anxiety attacks, hypothyroidism, reflux, dizziness and vertigo. Def. 56.1 Stmt. ¶¶ 86; AR 558-59. She was hydrated and discharged the same day. Def. 56.1 Stmt. ¶ 88; AR 559. On June 29th, she had an outpatient EDG for the reflux and informed the doctor that she was not feeling any pain in any part of her body. Def. 56.1 Stmt. ¶¶ 89-90; AR 579, 583, 905. Dr. Langan, who conducted the EDG, concluded that Ianniello had Grade III esophagitis, nonerosive gastritis and medium hiatal hernia and recommended that Ianniello try to lose weight. Def. 56.1 Stmt. ¶¶ 92, 94; AR 593.

On July 24th, Ianniello went to the emergency room complaining of pain in her left shoulder, left arm and chest. Def. 56.1 Stmt. ¶ 95; AR 613. Ianniello indicated that she smoked three cigarettes a day for thirty years, had high blood pressure and high cholesterol. Def. 56.1 Stmt. ¶¶ 96-97; AR 613. Ianniello underwent a Braden pressure sore assessment, which determined that her mobility was not impaired and that she was able to walk frequently. Def. 56.1 Stmt. ¶ 99; AR 629. Ianniello was kept overnight and a CT scan was performed the next day, which revealed a nodule on her left breast. Def. 56.1 Stmt. ¶¶ 100-01; AR 640. Ianniello was advised to follow-up with Dr. Oh to obtain a mammogram. Def. 56.1 Stmt. ¶¶ 101-02; AR 640, 685. On December 10th, Ianniello returned to the hospital complaining of dizziness and nausea and reported a history of hypertension, heart disease, GERD, right rotator cuff problems, fibromyalgia, hypothyroidism, chronic vertigo, and high cholesterol. Def. 56.1 Stmt. ¶¶ 104-05; AR 669-713. During that visit, Ianniello denied suffering from a "spinning" feeling in the past.

Def. 56.1 Stmt. ¶ 106; AR 727.  Ianniello was again diagnosed with, among other things, dizziness and giddiness secondary to BPPV and was kept overnight.  Def. 56.1 Stmt. ¶¶ 107-08; AR 714.

During her December hospital stay, Ianniello was also seen by a neurologist who concluded that she was suffering from recurrent episodic vertigo.  Def. 56.1 Stmt. ¶ 109; AR 735.  One of the neurologist at the hospital recommended that Ianniello have an MRI, under intravenous sedation, and an epilepsy consult.  Def. 56.1 Stmt. ¶¶ 110-11; AR 736-737.  A second neurologist, assigned the task of evaluating her "spinning" complaints, concluded that her vertigo was likely caused by BPPV, an inflammation of the inner ear or hyporthyroidism.  Def. 56.1 Stmt. ¶¶ 113-14; AR 737-38.  He also recommended that Ianniello undergo a brain MRI, as well as a tilt/table test.  Def. 56.1 Stmt. ¶ 115; AR 738.  During her neurology consult, Ianniello reported feeling depressed.  Def. 56.1 Stmt. ¶¶ 116; AR 737.

When Ianniello was discharged in December, Ianniello was advised that she could walk, drive, use stairs, bathe and work as tolerated.  Def. 56.1 Stmt. ¶ 126; AR 779.   In January Ianniello was again taken to the hospital by ambulance, where she complained of dizziness and vertigo.  Def. 56.1 Stmt. ¶ 127-28; AR 796.  Ianniello reported that her vertigo had persisted for two months but that her symptoms were sudden, constant, still present and worse than when they started.  Def. 56.1 Stmt. ¶¶ 128-29; AR 796, 799.  The attending doctor diagnosed her with intractable vertigo and admitted her to the hospital.  Def. 56.1 Stmt. ¶¶ 130-31; AR 799.  Ianniello noted having a history of fibromyaglia and anxiety, but did not mention depression.  Def. 56.1 Stmt. ¶¶ 132-33, 135; AR 805, 813.  Ianniello also reported that she occasionally walks and had no mobility impairment.  Def. 56.1 Stmt. ¶ 134, AR 811.  Ianniello was released the next

14

day and advised that she could work, walk, drive, navigate stairs and bathe as tolerated.  Def. 56.1 Stmt. ¶ 144; AR 857.

### 3. **Neurologic Testin**g

Several of Ianniello's neurologic tests were performed during her hospitalizations.  On December 11, 2007, Ianniello underwent an MRI of her brain, which found, among other things, chronic microvascular ischemic changes, which the radiologist noted could be consistent with demyelination, post infectious or post inflammatory process or vasculitis; a right upper molar extending into the maxillary sinus and no acute infarcts.  Def. 56.1 Stmt. ¶ 122; AR 740. Ianniello also underwent a tilt table test, which found Ianniello to be mildly positive for orthostatic hypotension.  Def. 56.1 Stmt. ¶¶ 123-14; AR 782-84.  Dr. Oh, who performed the test, recommended that Ianniello avoid sudden and prolonged standing and reduce her anti-hypotensive therapy.  Def. 56.1 Stmt. ¶ 125; AR 784.  Ianniello also had a CT scan of her head and brain, which was deemed unremarkable when compared to a 2004 CT scan, with no significant changes being found.  Def. 56.1 Stmt. ¶¶ 119-21; AR 739.

On January 26, 2008, Ianniello had another CT scan of her head and brain, which was compared to her November 2004 and December 2007 scans, and found to be normal.  Def. 56.1 Stmt. ¶¶ 136-38; AR 821.  That same day, Ianniello had an EKG, which was reported as abnormal but her doctor never documented any concerns.  Def. 56.1 Stmt. ¶¶ 139-40; AR 826-28.  On March 19, 2008, Ianniello was referred to Dr. Mandelbladt for a Nerve Conduction Study of the upper an lower extremities, which revealed no evidence of peripheral neuropathy.  Def. 56.1 Stmt. ¶¶ 189-90; AR 942.

### 4. **Dr. Oh**

Hartford also received medical records from Dr. Oh from August 2007 to January 7, 2008, several of which had been previously discussed. Def. 56.1 Stmt. ¶ 200; AR 109, 402-26. Ianniello was first seen by Dr. Oh on August 11, 2007. Def. 56.1 Stmt. ¶ 201; AR 402. Ianniello complained of past struggles with fibromyalgia, advised Dr. Oh of her prior disability status[8], had blood work drawn, which was normal, and was given a B12 injection. Def. 56.1 Stmt. ¶¶ 201-203; AR 402. Between November 2007 and January 7, 2008, Ianniello was seen by or had a phone consultation with Dr. Oh eight times. AR 413-19, 426. During the appointments, Ianniello had a variety of complaints including leg pain, nausea, bad headaches, a sore throat, and severe dizziness. Def. 56.1 Stmt. ¶¶ 204-225; AR 413-19, 426. Dr. Oh's assessed Ianniello for hyperthyroidism, fibromyalgia, mild anemia, GERD, IBS, and costochondritis. *Id.* Dr. Oh concluded that Ianniello was suffering from BPPV and fatigue. Def. 56.1 Stmt. ¶¶ 209, 211, 216; AR 415-16, 418.

In December 2007, Dr. Oh completed an APS for Ianniello's application for disability benefits. Def. 56.1 Stmt. ¶ 213; AR 417. In the APS, Dr. Oh concluded that Ianniello was suffering from vertigo. Def. 56.1 Stmt. ¶ 214; AR 942. On January 3, 2008, Dr. Oh decided to have Ianniello treated for sleep apnea and added anxiety to his diagnosis. Def. 56.1 Stmt. ¶ 217, 220; AR 419. During the January 3rd visit, Dr. Oh addressed the possibility of Ianniello returning to work and Ianniello expressed anxiety about riding the bus through a tunnel but agreed to attempt to return to work on January 11, 2008. *Id.* However, four days later, Ianniello returned to Dr. Oh reporting that she could not return to work. Def. 56.1 Stmt. ¶ 222; AR 426. Dr. Oh

---

[8]The record does not indicate why Ianniello was out on disability between 2004 and 2006.

agreed to certify her inability to work for one week.[9]  Def. 56.1 Stmt. ¶ 223; AR 426.

## F. Hartford's Review and Denial of Ianniello's Claim

On September 22, 2008, the above-mentioned medical records were forward to Michelle McNamara ("McNamara"), a Medical Case Manager, to determine Ianniello's functional limitations.  Def. 56.1 Stmt. ¶ 226; AR 115.  That day, McNamara contacted Ianniello who reported that her primary diagnosis from Dr. Anderson, who was her "only treating physician," was chronic fatigue syndrome.[10]  Def. 56.1 Stmt. ¶ 229-30; AR 108.  Ianniello also complained of pain from bulging discs in her neck, but indicated that she had not been treated for the condition.  Def. 56.1 Stmt. ¶ 232; AR 108.  As far as restrictions and limitations, Ianniello reported to McNamara that she could stand or walk for 25 minutes without a device; could sit for 20 minutes then needed to change positions so she wouldn't get stiff; could hold a glass in her right hand but had trouble writing; and could not lift anything, but had no trouble reaching.  Def. 56.1 Stmt. ¶ 233; AR 109.

Given the apparent inconsistency between Dr. Anderson's June 2008 statement of restrictions and Ianniello's own claims, McNamara sought clarification from Dr. Anderson with respect to Ianniello's restrictions and limitations, her return to work capability and the etiology of her purported "chronic fatigue syndrome," asking specifically if she could perform a sedentary occupation.  Def. 56.1 Stmt. ¶¶ 234-36; AR 107-09; Pl. 56.1 Stmt. ¶ 44; AR 1180-81.  After twice contacting Dr. Anderson by phone to obtain a response, Dr. Anderson clarified his APS by

---

[9]Dr. Oh did not perform a trigger point test to confirm the diagnosis of fibromyaglia or recommend that Ianniello have a psychiatric consult.  Def. 56.1 Stmt. ¶¶ 224-25.

[10]Ianniello confirmed during that call that Dr. Perel had advised her that she did not have Parkinson's Disease.  Def. 56.1 Stmt. ¶ 231; AR 108.

letter dated November 3, 2008. Def. 56.1 Stmt. ¶¶ 237, 241; AR 103, 105. Dr. Anderson stated

that Ianniello had "chronic fatigue not the overused undetailed term chronic fatigue syndrome."[11]

AR 1168. Dr. Anderson also noted:

> 1. . . . Patient has been diagnosed with hypertension and arthritis. She also has severe fibromyalgia, which makes daily activities painful and difficult, secondary to severe hypothyroidism and adrenal insufficiency. She is able to perform spurts of several minutes, with subsequent malaise and mylagias. This is not feasible in a working day. She also suffers from Fe and B12 deficiency.

> 2. Her treatment plan is as follows 1) medications including thyroid supplementation with follow up therapeutic serum levels. Lyrica for pain control. To make matters worse, vertigo while on NSAIDS developed a peptic ulcer and now is in worse pain 2) Frequent B12 injections 3) Exercise. Physical therapy involving hand extensions and cardio of 3-5 minutes. . . 5) Sleep of 5 cycles in 8-9 hours per night, which she was unable to satisfy while working.

> 3. The tremors are due to [illegible] & are increased as physical demand increase.

AR 1167-1170. Dr. Anderson concluded that he did not feel Ianniello could return to work at a

full time sedentary physical demand job. Def. 56.1 Stmt. ¶ 251; AR 1170.[12]

In the meantime, McNamara also referred the claim to MES Solutions Peer Review

Services, an independent medical peer review consultant, to determine Ianniello's maximum

functional capability. Def. 56.1 Stmt. ¶ 238-40; AR 105-06. Dr. Campo was retained to perform

---

[11]Hartford's 243rd statement in not consistent with the record.

[12]Hartford contends that Dr. Anderson did not provide any "objective diagnostic testing or examination results" to support his conclusion. Def. 56.1 Stmt. ¶ 252; AR 1167-1170. Ianniello contends that he was only asked for "current restrictions and limitations," but acknowledges that he was asked for all current clinical findings and diagnostics to support her continued limited activity level. Pl. 56.1 Ctr. Stmt. ¶ 252.

the peer review.  Def. 56.1 Stmt. ¶ 253; AR 101, 379.  Dr. Campo reviewed all of Ianniello's medical records, diagnostic testing and tried unsuccessfully to speak to Dr. Anderson.  Def. 56.1 Stmt. ¶¶ 254-55; AR 379-381.  In his report, Dr. Campo noted that the MRI showed chronic multivascular ischemic changes, but stated that the CT scans had been normal and the tilt test, which had been mildly positive, only recommended avoiding sudden position changes and to decrease anti-hypotensive medications.  Def. 56.1 Stmt. ¶¶ 255-56; AR 101.  Dr. Campo specifically  stated that "[t]he head up tilt table testing . . . resulted in recommendations to avoid sudden changes in position. . . the results of the test and the symptoms given make the able restrictions valid.  I would maintain that, given these restrictions, this claimant can work a forty hour week."  Def. 56.1 Stmt. ¶ 261; AR 382.  Accordingly, Dr. Campo concluded that Ianniello could work an 8 hour day forty hours per week although her standing would be restricted to 30 minutes at a time, her walking would be restricted to 20 minutes at a time, she would be restricted from lifting over 10 pounds or from climbing, balancing, kneeling, crawling, stooping, crouching and reaching below the waist.  Def. 56.1 Stmt. ¶¶ 257-59; AR 381-82.

Upon receipt of Dr. Campo's report, McNamara concluded that Ianniello could return to a full time sedentary capacity level job and returned the file to Amy Cook ("Cook"), Hartford's Ability Analyst.  Def. 56.1 Stmt. ¶ 263; AR 99-100.  Upon receipt, Cook nonetheless arranged for an Occupational Analysis to be completed because AIG had indicated in the PDA that Ianniello had to travel occasionally (1-33%) and had stated in the Job Description that 50% of her job included a mix of domestic and international travel.  AR 99, 1262.  The Occupational Analysis, completed on December 10, 2008 by Lisa Housley, concluded that Ianniello's position of Manager of Multi-National Accounts was the equivalent of an 'Sales Agent, Insurance" which

19

required work to be completed at a "light physical demand level," and based on the written description on the file, would also require travel on a frequent basis in the northeast. Def. 56.1 Stmt. ¶¶ 265-66; Pl. 56.1 Stmt. ¶ 48; AR 99.

Based on the Occupational Analysis, Cook recommended that Ianniello's claim for long term disability benefits be approved, but stated that she could probably perform a secondary occupation. Def. 56.1 Stmt. ¶ 267; Pl. 561. Stmt. ¶ 49; AR 96-99. However, still concerned with the discrepancy between Ianniello's PDA and Job Description, Cook sought clarification from AIG's Human Resource Department. Def. 56.1 Stmt. ¶¶ 268-69; Pl. Ctr. Stmt. ¶ 268; AR 1141. On December 15, 2008, Anna Goodger ("Goodger'), AIG's Human Resource representative, sent Cook an e-mail that stated:

> The Manager of Multi-National Accounts role is a **sedentary occupation** with little or no travel required. I assume the job description that you refer to is the job description that was created when the staffing model for AIG Travel began. I don't see an attachment to the e-mail, so am not sure what document you are looking at. Since that time, and since the time [Ianniello] assumed the role of Manager of Multi-National Accounts, it realized that the travel component as originally stated was not required of this role.

Def. 56.1 Stmt. ¶ 270; AR 1141-42 (emphasis added). Upon receipt of AIG's job clarification, Hartford determined that it could not adopt Cook's earlier recommendation to approve the claim given that her determination had been based on a belief that she had a light duty, not a sedentary job without travel. Def. 56.1 Stmt. ¶ 271-73; AR 95, 98. Ianniello contends that this determination disregarded the fact that her "job as recognized in the general workplace" was a job that she was unable to perform. Pl. Ctr. 56.1 Stmt. ¶ 271-73.

On January 2, 2009, Hartford denied Ianniello's claim for long term disability benefits.

Def. 56.1 Stmt. ¶ 276; AR 95.   Hartford advised Ianniello that her claim had been denied

because her Job Description, additional information from her employer, and her PDA reflected

that her occupation was sedentary and based on all of the medical information in her file,

Hartford had concluded that she was able to perform a sedentary job on a full time basis.  Def.

56.1 Stmt. ¶¶ 277-79; AR 363-67.  Hartford stated that it had specifically relied on the March

2008 Nerve Conduction test, which revealed that Ianniello was in normal limits, Dr. Anderson's

November 2008 clarification, and Dr. Campo's conclusion that she could work 8 hours, 40 hours

per week based on a review of all of her medical records including the findings of the tilt table

test.  Def. 56.1 Stmt. ¶¶ 280-83; AR 366, 1167-1170.

## G.  Ianniello's Appeal

On June 26, 2009, Ianniello appealed Hartford's decision to deny her long term disability

benefits.  Def. 56.1 Stmt. ¶ 289; AR 2525- 2573.  Ianniello's appeal consisted of a letter

challenging the findings; a notice that she had been awarded SSDI benefits; a sworn declaration;

additional medical records; literature regarding her condition; and a transcript of a deposition of

Dr. Bahnam from MES Solutions.  Pl. 56.1 Stmt. ¶ 55; AR 2525-3131.  On August 5, 2009,

Ianniello's counsel supplemented the appeal letter with additional information.  Def. 56.1 Stmt. ¶

290; AR 1865-2524.  In her declaration, Ianniello averred that she was suffering from

fibromyalgia, chronic fatigue, arthritis, hypothyroidism, anxiety B claustrophobia, and GERD.

Def. 56.1 Stmt. ¶ 307; AR 2577.   Ianniello stated, among other things, that she often stays in the

house because she is in too much pain to go out; she is only able to stay on the computer a short

time because of back pain; she takes a nap at least once a day; she can dust and cook on a

minimal basis; she suffers side-effects from the medication; and once a week goes out to shop for

an hour or so.  Pl. 56.1 Stmt. ¶ 56; Def. 56.1 Stmt. ¶ 313; AR 2578-80.  Ianniello further stated

that she cannot travel to work; that stress exacerbates her tremor and fatigue; that she cannot

travel through the tunnel to work because of her anxiety attacks and claustrophobia[13]; and that

she cannot do any duties of her own job.  Pl.. 56.1 Stmt. ¶ 57; Def. 56.1 Stmt. ¶ 314; AR 2580.

Ianniello addressed the Job Description that had initially been submitted by AIG, and

acknowledged that it was incorrect.  Def. 56.1 Stmt. ¶ 309; AR 2578.  She stated that when she

was hired she was told she'd have to travel 20 to 25% of the time, but she actually spent most of

the time at her desk using her hands, typing on a keyboard, making power point presentations and

speaking on the phone.[14]  Def. 56.1 Stmt. ¶ 310; AR 2578.  Ianniello also submitted hundred of

pages of discovery produced from another case to address Ianniello's claim that Hartford was

operating under a conflict of interest and used insufficient procedures and methods utilized in

deciding her claim.  Def. 56.1 Stmt. ¶¶ 315-18; AR 1865-2524; 2525-3131.

Hartford contends that the appeal letters contained only a minimal amount of relevant

information that was not already in the record.  Def. 56.1 Stmt. ¶ 292.  Ianniello did provide

Hartford with the June 26, 2009 Social Security benefits award notification, but did not provide

any information from the Social Security Administration explaining the basis for its

determination.  Def. 56.1 Stmt. ¶¶ 293-94; AR 2575.  Ianniello also provided Hartford with

additional medical records from Dr. Anderson.  Def. 56.1 Stmt. ¶¶ 295-98; AR 2582-2651.

Ianniello resubmitted notes from all of her office visits that had already been reviewed and added

---

[13]Ianniello has not addressed whether there is an alternative route to her job.

[14]Ianniello indicated that she had traveled once in the year she had been working at AIG
Travel, but was "budgetted" to travel six times in 2008.  AR 2578.

notes from September 4, 2008 through February 2, 2009. Def. 56.1 Stmt. ¶¶ 296-97; AR 2581-2651. Hartford contends that the records were illegible, a fact Ianniello disputes, but both agree that Ianniello had not undergone any additional testing during the time period.[15] Def. 56.1 Stmt. ¶¶ 297-98; Pl. Ctr. Stmt. ¶ 297.

Ianniello also provided Hartford with a May 9, 2006 report from the Inner Ear Institute. Def. 56.1 Stmt. ¶ 299; AR 2766. The report reflects that Ianniello had complained of dizziness, which she described as "head spinning." Def. 56.1 Stmt. ¶ 301; AR 2766. The Inner Ear Institute concluded that Ianniello had a 15% bilateral hearing loss but was otherwise normal. Def. 56.1 Stmt. ¶ 302; AR 2766. Ianniello also submitted notes from a March 2006 exam conducted by Dr. Carl Wiesenthal, in which he diagnosed Ianniello as having chronic vertigo for three weeks, but ruled out vestibular neuritis. Def. 56.1 Stmt. ¶ 303; AR 2768.

On July 7, 2009, Hartford sent Ianniello's file to its Appeals Unit. Def. 56.1 Stmt. ¶ 331; AR 90. Judith Rose ("Rose") was assigned to review Ianniello's appeal. Def. 56.1 Stmt. ¶ 332; AR 90. Rose determined that the file should be again reviewed by an independent medical record peer review consultant to determine Ianniello's functionality and psychiatric condition and forwarded the file to University Disability Consortium ("UDC"). Def. 56.1 Stmt. ¶ 333-34, 350; AR 88-90. Rose also sent letters to Drs. Oh, Anderson and Goldstein advising them that they would be contacted by the peer review consultant concerning Ianniello's claim. Def. 56.1 Stmt. ¶ 335; AR 218-220.

UDC assigned the file to Dr. James Bress, who is board certified in internal medicine.

---

[15]The court notes that Dr. Anderson's records are handwritten and are very difficult to read. Ianniello made no attempt to provide Hartford with more legible records despite the fact that she criticizes Hartford's failure to consider Dr. Anderson's findings.

Def. 56.1 Stmt. ¶ 336; AR 237.  Dr. Bress reviewed all of Ianniello's medical records and

concluded that Ianniello did not meet the CDC criteria for fibromyalgia because she did not have

a positive trigger point test.  Def. 56.1 Stmt. ¶ 340-341; AR 241.  As previously indicated there is

evidence in the record that Ianniello did have "trigger points," although the specific pain points

do not appear to be noted.[16]  AR 2738, 1288, 2632, 2642.  Dr. Bress also concluded that Ianniello

did not meet the criteria for Chronic Fatigue Syndrome, noting that no doctor had done an

objective evaluation of her fatigue complaints and that the complaints themselves were

intermittent.[17]  Def. 56.1 Stmt. ¶ 342; AR 241.  Dr. Bress further concluded that based on the

results of the tilt table test, which demonstrated a drop in blood pressure, Ianniello was not

restricted by her vertigo.  Def. 56.1 Stmt. ¶ 343; AR 241, 243.  Dr. Bress also reported that there

was no documentation that Ianniello would be restricted from any adverse effects of her

medication and that hypothyroidism would not cause fatigue but have the opposite effect.  Def.

56.1 Stmt. ¶ 342; AR 242.

Dr. Bress documented that he had tried to call Drs. Oh, Anderson and Goldstein three

times and only heard from Dr. Goldstein who reported that he had not seen Ianniello since 2005.

Def. 56.1 Stmt. ¶¶ 348-49; AR 240, 242.  Dr. Bress concluded that Ianniello was capable of a full

time sedentary job with frequent sitting, occasional walking, bending, crouching, stooping,

kneeling and crawling.  Def. 56.1 Stmt. ¶ 344; AR 241-42.  Dr. Bress stated that Ianniello had no

restriction at the waist, shoulder level, below the shoulder or on handling, feeling, use of the

---

[16]Dr. Bress did indicate in his report that the medical records were handwritten and very
difficult to read.  Def. 56.1 Stmt. ¶ 337; AR 237.

[17]Ianniello does not claim to have CFS simply "chronic fatigue."  But Bress' finding that
no doctor had evaluated her complaint of fatigue is still relevant.

computer or driving.  Def. 56.1 Stmt. ¶ 345; AR 242.  He found that she should be limited to lifting a maximum of 20 pounds and should not work on ladders, at heights, or on dangerous machinery.  *Id.*

Dr. Melvin Lurie, a board certified psychiatrist, was assigned to conduct the independent psychiatric review.  Def. 56.1 Stmt. ¶ 351; AR 244-250.  Dr. Lurie also attempted to contact Dr. Anderson and his call was not returned.  Def. 56.1 Stmt. ¶ 353; AR 248.  Dr. Oh's office did return his call but indicated that Dr. Oh had not treated Ianniello in the past 14-15 months.  Def. 56.1 Stmt. ¶ 345; AR 248.  Dr. Lurie also consulted with Dr. Bress before issuing his report. Def. 56.1 Stmt. ¶ 355; AR 248.  Based on a review of all of Ianniello's record, Dr. Lurie did not find any evidence of a psychiatric condition in her records.  Def. 56.1 Stmt. ¶ 356; AR 249.  Dr. Lurie acknowledged Ianniello's complaint that claustrophobia was preventing her from getting to work through the tunnel and that she had anxiety, but found that there was no credible evidence that the claustrophobia or any other psychiatric component to her claim would incapacitate her. Def. 56.1 Stmt. ¶ 358, 361; AR 240-50.  Dr. Lurie further concluded that even given her complaints of pain, fatigue, and lack of sleep, there was no evidence showing that she would be unable to concentrate during a forty hour work week.  Def. 56.1 Stmt. ¶ 360; AR 250.

On November 2, 2009, Rose reviewed the reports received by the peer review consultants, Ianniello's medical records, and Ianniello's appeal letter and decided to uphold Hartford's decision to deny benefits.  Def. 56.1 Stmt. ¶¶ 362-64; AR 84-88, 272-278.  In its letter to Ianniello, Hartford referred to the opinion of Dr. Bress that Ianniello was "capable of full-time work from 12/4/07 forward" and of Dr. Lurie that there was no evidence of a psychiatric component to Ianniello's complaints or purported limitations.  Def. 56.1 Stmt. ¶¶ 365-70; AR

249-50.  In sum, Hartford concluded that Ianniello's documentation did not corroborate her report of limitations, and thus, she did not satisfy the policy definition of disability.  Def. 56.1 Stmt. ¶ 371; AR 278.

## DISCUSSION

### A.    Summary Judgment Standards

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson,* 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000) (quoting *In re Blackwood Assocs., L.L.P.*, 153 F.3d 61, 67 (2d Cir. 1998) and citing Fed. R. Civ. P. 56 (c) and *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party.  *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998).   If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable.  *See Holt v. KMI-Continental, Inc.*, 95 F.3d 123, 129 (2d Cir. 1996), *cert denied,* 520 US 1228 (1997).

"Although there is no right to a jury trial in a suit brought to recover ERISA benefits, and thus the district court [will be] the factfinder at trial, the district court's task on a summary judgment motion - even in a non-jury case - is to determine whether genuine issues of material fact exist for trial, not to make findings of fact."  *O'Hara v. Nat'l Union Fire Ins. Co.,* 2011 U.S. App. LEXIS 7675 *13-14 (2d Cir. 2011)(internal citations omitted)(district court erred when it weighed competing physicians opinions and made findings based on its own consideration of the

evidence).  "[R]egardless of the district's standard of review of the plan administrator's denial of benefits, a district court may not grant a motion for summary judgment if the record reveals a dispute over an issue of material fact." *Id.* at *15.  Although, "in some circumstance, it may be appropriate for the district court to treat a motion for summary judgment as requesting 'essentially a bench trial on the papers' with the District Court acting as the finder of fact.  In that scenario, . . . it must be clear that the parties consent to a bench trial [on papers]."  *Id.* (internal citations omitted).  Here, the parties did not agree to a bench trial on papers, so the undersigned is "obliged to proceed in traditional summary judgment fashion." *Id.*; *see also Kagan v. Unum Provident,* 2011 U.S. Dist. LEXIS 40098 *35 (S.D.N.Y. Mar. 31, 2011)(if summary judgment is denied because material facts are in dispute, a bench trial is then conducted with the court acting as the trier of fact).

B.    **ERISA Standards**

"ERISA permits a person denied benefits under an employee benefit plan to challenge the denial in federal court."  *Lopes v. First Unum Life Ins. Co.,* 2011 U.S. Dist LEXIS 34205 * 9 (E.D.N.Y. Mar. 30, 2011)(citing to 29 U.S.C. § 1132 (a)(1)(B)).  The Supreme Court has held that "a denial of benefits under [ERISA] § 1132(a)(1)(B) must be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan."  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948 (1989); *see Celardo v. GNY Automobile Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003).

Where, as here, a plan confers upon the administrator such discretionary authority, a district court must conduct its review with a strong measure of deference and "will not disturb

the administrator's ultimate conclusion unless it is arbitrary and capricious." *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 441 (2d Cir. 1995) (internal quotation marks and citation omitted); *see Pulvers v. First UNUM Life Ins. Co.*, 210 F.3d 89, 92 (2d Cir. 2000) (same); *see also Peterson v. Cont'l Cas. Co.*, 282 F.3d 112, 117 (2d Cir. 2002). Arbitrary and capricious means "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Lopes,* 2011 U.S Dist. at * 9. Under this deferential standard, a district court's review "is limited to the administrative record." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995).

## C. Ianniello's Contention that a Conflict of Interest Influenced Hartford's Decision.

Ianniello contends that Hartford operates under a conflict of interest and that the conflict should be weighed very heavily by the court. Pl. Mem. at 6. It is true that "when applying the deferential standard, courts must take into account any conflict that the plan administrator may have." *Lopes,* 2011 U.S. Dist. LEXIS at *9. "A conflict is present where, [as here], the plan administrator is also the payor of benefits." *Id.* (citing *McCauley v. First Unum Life Ins. Co.,* 551 F.3d 126, 133 (2d Cir. 2008)). However, the presence of a conflict is one of many factors a court should consider. *Id.* The Second Circuit has provided guidelines for the weight to give this factor:

> '[W]here circumstance suggest a higher likelihood that [the conflict] affected the benefits decision, including, but not limited to, cases where an insurance company has a history of biased claims administration,' the conflict of interest
>
>> should prove more important (perhaps of great importance) . . . . It should prove less important (perhaps to a vanishing point) where the administrator has taken steps to reduce potential bias and to promote accuracy, for example by walling off claims administrators from those

> interested in firm finances, or by imposing
> management checks that penalize inaccurate
> decisionmaking irrespective of whom the
> inaccuracy benefits.

*McCauley,* 551 F.3d at 133.

Here, Ianniello identifies the following conduct in support of her contention that the

conflict affected Hartford's decision:

> 1.  Hartford failed to give any weight to the SSDI award or explain
> why it didn't;
>
> 2.  Hartford failed to properly apply the policy terms;
>
> 3.  Cook's initial review recommended granting benefits and was
> then overturned;
>
> 4.  Hartford emphasized medical reports supporting denial of
> benefits and de-emphasized reports and analysis to the contrary;
> and
>
> 5.  Hartford asserted new reasons for its denial of the appeal above
> and beyond those asserted in its initial denial, for example, denying
> for the first time the diagnosis of fibromyalgia in the appeal.

Pl. Mem. at 6.  Ianniello further identifies the following procedural irregularities:

> 1.  Initially giving one reason for denying a benefits claim and then
> offering a new reason for denial on review in addition to the
> original reason;
>
> 2.  Emphasizing a certain medical report that favors a denial of
> benefits and de-emphasizing certain other reports that suggest a
> contrary conclusion;
>
> 3.  Relying on the opinions of its own non-treating physicians;
>
> 4.  Encouraging the claimant to argue to the Social Security
> Administration that she could not do work and then ignoring that
> conclusion.

Pl. Mem. at 6-7.

These examples of conduct and procedural irregularities do not suggest a higher likelihood that Hartford was affected by its conflict in making its benefit decision. To begin with, Ianniello's claim that Hartford failed to even mention the Social Security determination is without merit. Pl. Mem. at 7. In the November 2, 2009 appeal determination letter, Hartford informed Ianniello that it had reviewed the SSDI award notification in making its determination. AR 222. However, Ianniello had only submitted the award notification without providing the Social Security Administration's rationale for awarding benefits. Moreover, even if Ianniello had provided Hartford with the SSDI's rationale, Hartford would not have been bound by the opinion. *Fortune v. Group Long term Disability Plan,* 2010 U.S. App. LEXIS 18195 *10 (2d Cir. Aug. 30, 2010).

Ianniello's argument that Hartford failed to properly apply its own policy terms is also without merit. Essentially, Ianniello argues that even if she is able to perform her actual duties, those being, the ones clarified by AIG's Human Resources representative, Hartford should have considered her "job as recognized in the general workplace," which is a light duty job requiring frequent walking and standing. Ianniello's argument completely disregards the fact that Hartford's initial designation of her job as "light duty" was based on incorrect information provided by Ianniello. Specifically, the Job Description and PDA indicated that she was required to travel either 1-33% or 50% of the time. Moreover, Ianniello confirmed in her declaration in support of her appeal that she spent most of the time at her desk.

Similarly, it is clear from the record that Cook initially recommended granting Ianniello's claim because she was concerned that Ianniello would not be able to travel. Yet, concerned with

the discrepancy between Ianniello's PDA and Job Description, and recognizing that Ianniello could perform a sedentary job, Cook sought clarification from AIG's Human Resources even though she had already recommended approving the claim.   AR 1141.   Accordingly, there is nothing suspect about Hartford's decision to overturn Cook's initial determination once Ianniello's job description was clarified.

Nor is the fact that Hartford asserted new reasons for its denial of the appeal evidence to support a finding that Hartford was influenced by its conflict.   Ianniello argues, in this regard, that for the first time on appeal, Hartford questioned her diagnosis of fibromyalgia.   Although Ianniello is correct that Hartford referenced Dr. Bress' conclusion that she did not meet the CDC criteria for fibromyalgia in its appeals determination letter, that opinion that had not been rendered at the time of the initial denial.   Hartford's initial denial reference all of the then available medical records when it concluded that her claim was not supported.   Finally, Ianniello's contention that Hartford emphasized medical reports supporting the denial of Ianniello's claim and de-emphasized reports and analysis to the contrary and that it relied on the opinions of its own non-treating physicians will be addressed below, but is not evidence that Hartford was affected by its conflict.

Ianniello also argues that Hartford has a history of biased claims administration. Specifically, Ianniello argues that Hartford's reliance on UDC and MES Solutions for its independent peer review services, companies that greatly benefit from Hartford's repeat business, casts doubt on the neutrality of those decisions.   Pl. 56.1 Stmt. ¶¶ 63-68.   Ianniello further argues that Dr. Bress's conclusion should be discredited because he financially benefits from repeat

business[18] that comes from opinions that Hartford likes, opinions that are often discredited by the courts. *Id.*

Hartford disputes these contentions arguing as a threshold matter that the court should not consider any evidence outside of the administrative record. Hartford also contends that (1) it does not provide its ability analysts, claims specialists, assistant LTD directors or appeals specialist with any incentive or bonuses based on the denial of claims. *See* Luddy Dec. ¶ 8. Hartford maintains a separate appeals unit for consideration of claims that are denied and Hartford contends that each appeals specialist is charged with making an independent assessment of an adverse claims decision based upon all of the information in the file. *Id.* at ¶¶ 3, 4. Hartford does not permit its appeals specialist to talk to the ability analyst that made the initial benefits decision and the claims and appeals units are completely separate business units from the financial and underwriting units. *Id.* at ¶¶ 5, 12. As such, Hartford contends that it has "walled off" its claims administrators from those interested in finances so as to reduce the potential for the conflict of interest to influence its decision making. *See Metropolitan Life Insurance Co. v. Glenn,* 128 S. Ct. 2343, 2351 (2008).

While the court remains mindful of the issue concerning neutrality, it is clear that Hartford has taken steps to reduce potential bias. Guided by the principles set forth in *McCauley*, the court will consider the conflict in making its determination, but does not believe it to be of "great importance."

---

[18]Dr. Bress was assigned to 314 Hartford claims between 2006 and 2009. *See* Rosati Dec. ¶ 3, Ex. 1, Interrogatory Response No. 17.

**D. Hartford's Denial of Benefits.**

Hartford contends that summary judgment should be granted in its favor because it determination that Ianniello had failed to demonstrate that she was disabled was based on substantial evidence, and not arbitrary and capricious. Hartford argues, in this regard, that Ianniello did not submit proof demonstrating that she was unable to perform the essential duties of her own occupation during the elimination period, and thereafter. As previously stated, under the long term disability plan, Ianniello would have been considered disabled if during the elimination period, in this case from December 5, 2007 to June 3, 2008, and thereafter, she had been prevented from performing one or more of the essential duties of her occupation.[19] Although Hartford actually paid Ianniello short term benefits through June 30, 2008, Hartford contends that after reviewing all of the medical records in Ianniello's file, it determined that Ianniello could perform the sedentary duties of a Manager of Multi-National Accounts, on a full time basis.

Hartford's initial contention that Ianniello's medical records mostly contain contradictory and conclusory opinions of her treating physicians that do not provide a basis for her purported functional limitations is supported by the record. For example, Ianniello submitted medical records from Dr. Oh who opined in late January 2008 that she could not work with or without limitations. Dr Oh then went on to note that this condition was merely temporary and that she would be able to return to work in two weeks. AR 419, 426. Apparently dissatisfied with Dr.

---

[19]As previously stated, in December 2007, Ianniello claimed to the aspect of her condition that made her unable to work was "vertigo, dizziness and nausea. In June 2008, on her long term disability application, Ianniello said it was "dizziness, tremors, exhaustion, and pain." AR 79, 459.

Oh's findings that she could return to work, Ianniello sought treatment with Dr. Anderson. Dr. Anderson's treatment records track an interesting course. His medical findings throughout essentially mirror Ianniello's complaints and for the most part are not only unsupported by objective tests but appear in some instances to stand in contradiction of test results. For example, on February 5, 2008, Dr Anderson found that Ianniello suffers from fatigue, adrenal syncope, vertigo, and hypertension. Those findings mirror Ianniello's complaints. Her EKG and Cardiac Doppler tests were normal. By February 2008, Dr Anderson concluded that Ianniello suffers not only from fatigue, but added dyspnea (essentially shortness of breath), B12 deficiency, and fibromyalgia to his findings. Once again, his findings duplicate Ianniello's complaints with the exception of the B12 finding. Ianniello's blood work however tested within normal limits. Although less than a month earlier, Dr. Oh had concluded that Ianniello could return to work, Dr Anderson contradicted that conclusion finding that Ianniello could not work although, somewhat oddly, indicated she could function normally at home. By March 11, 2008, Dr Anderson expanded his diagnosis to include dizziness, a B12 deficiency, and a peptic ulcer. Once again Ianniello's blood work tested normal as did an earlier CAT scan and MRI. Curiously, Ianniello's testing confirmed a peptic ulcer, but she did not list it as a basis for her disability claim on the application. By April 1, 2008, Dr. Anderson had expanded his diagnosis to include hypertension and Parkinson's disease noting that Ianniello simply could not return to work. Despite these findings, Ianniello conceded she does not have Parkinson's disease and her subsequent hemodynamic studies testing blood pressure and flow revealed that seven out of ten times her results were normal with only three slightly abnormal findings. AR 1288, 2579.

In his June 2008 APS, Dr. Anderson restricted Ianniello's standing to 15 minutes, walking to 20 minutes, sitting to 10 minutes and pushing and pulling to less than one hour. Yet, in September, Ianniello reported to McNamara that she could stand or walk for 25 minutes without a device; could sit for 20 minutes then needed to change positions so she wouldn't get stiff; could hold a glass in her right hand but had trouble writing; and could not lift anything but had no trouble reaching. AR 109. Around that same time, Dr. Anderson then submitted his undated APS, in which he opined that Ianniello was unable to return to work, although he stated in the same letter that she was able to function normally at home and work for two hours at a time. AR 1302.

As noted, Hartford also correctly contends that the administrative record is devoid of any objective proof to confirm the existence of a condition that could be clinically correlated to her subjective complaints of "dizziness, loss of appetite, exhaustion, hair loss, tremors and pain." Ianniello's medical records were reviewed internally by Cook, McNamara, and Rose, and externally by Drs. Campo, Bress and Lurie. The results of her 2007 and 2008 CT scans of her brain and EMG/nerve conduction study were deemed unremarkable. AR 739, 821, 942. The results of her tilt table test were mildly positive, and she was advised to avoid sudden and prolonged standing. AR 784. When Hartford asked Dr. Anderson to provide his clinical findings and diagnostics to support Ianniello's continued limited activity level, Dr. Anderson again reported that he had diagnosed Ianniello with chronic fatigue and fibromyalgia but did not provide the results on any testing or examination results. AR 1170.

In reaching its determination, Hartford also relied on (1) Dr. Campo's conclusion that notwithstanding the slightly positive tilt table test, Ianniello could work for an 8 hour day for

forty hours per week, as long as her standing was restricted to 30 minutes and her walking to 20 minutes at a time (AR 381-82); (2) Dr. Bress' determination that Ianniello did not meet the criteria for fibromyalgia or CFS and that, while she did meet the criteria for vertigo, she could work a sedentary job (AR 241-42); and (3) Dr. Lurie's determination that there was nothing in the record to suggest that Ianniello was suffering from an active psychiatric condition or that there was a psychiatric component to her alleged limitations (AR 249-50). Accordingly, after having all of Ianniello's record reviewed, Hartford determined that "although the documentation [did] support [the fact that] Ms. Ianniello is diagnosed with medical conditions, the record . . . does not corroborate that she satisfies the policy definition of disabled."

Ianniello disagrees that Hartford's conclusion was supported by "sufficient evidence" and argues, in contrast, that she is entitled to benefits as a matter of law. Ianniello emphasizes that Hartford (1) re-characterized her position as sedentary rather than light duty in violation of the policy; (2) failed to consider her complaints of fatigue; (3) failed to consider her pain; and (4) failed to consider the side effects of her medication. Ianniello further argues that conclusions of Drs. Campo, Bress and Lurie are not credible. Ianniello contends that Dr. Campo's conclusion that she could work a full-time job is meaningless because he did not address her pain, fatigue, fibromyalgia, hypothroidism, and adrenal insufficiency in his review.

Ianniello also argues that Dr. Bress' conclusion is suspect because he never examined her and there is no objective test to confirm fibromyalgia. Moreover, Ianniello states that despite Bress' contention, Dr. Anderson did reference "trigger points" and conclude that she had fibromyalgia. In addition, Hartford used Dr. Bress 314 times in a four year period, suggesting that Dr. Bress' opinions are far from neutral. Finally, Ianniello contends that Dr. Lurie's opinion

does not provide a basis on which to deny benefits. Ianniello contends, in this regard, that Dr.

Lurie was only able to conclude that her anxiety attacks and claustrophobia were not

incapacitating because he not realize that her job involved travel. Ianniello also argues Dr.

Lurie's statement that he did not find any evidence of a psychiatric condition in her records (*see*

AR 249) disregards that fact that she was prescribed Lexapro and Prozac.

In making these arguments, Ianniello chooses to ignore the fact that:

1. The initial designation of her job as light duty was based the Job Description and PDA provided by AIG, which Ianniello later acknowledged did not accurately reflect her job duties[20];

2. Dr. Oh, one of her treating physicians, not only determined that she could return to work during the elimination period, but urged her to do so;

3. Dr. Anderson appeared to alter his conclusions as Ianniello changed her subjective complaints; diagnosing her with Parkinson's Disease in April 2008, with chronic fatigue secondary to fibromyalgia and hypothyroidism in June 2008, with severe fibromyalgia, hypothyroid, fatigue, and hypertension in or around September 2008, and with arthritis, fibromyalgia, hypothyroidism, and adrenal insufficiency in November 2008;

4. Dr. Anderson referenced "trigger points" generically, but did not report the actual results of a trigger point test or where Ianniello had tender points for pain;

5. Ianniello reported she was able to do more that Dr. Anderson had reflected in his limitations and restrictions;

6. Hartford did not disregard Ianniello's complaints of pain associated with the fibromyalgia or fatigue, rather, it asked Dr. Anderson to clarify Ianniello's restrictions and limitations and to

---

[20]Ianniello asserts that Hartford should have prepared another Occupational Analysis after AIG clarified her actual job duties. The court agrees that given the fact that Ianniello confirmed the physical demands of her job, which were clearly sedentary, an additional Analysis was unnecessary.

provide any clinical findings or diagnostics to support the restriction. Dr. Anderson responded by essentially repeating his diagnosis and Ianniello's limitations;

7. With the exception of Dr. Perel's suggesting that Ianniello's tremors might be associated to her medication, there is nothing in the record indicating that Ianniello complained to any of her treating physicians about the adverse side effects of her medication; and

8. Notwithstanding the fact that Ianniello was taking Lexipro and Prozac and had at times complained of anxiety and depression, Ianniello had never submitted any documentation suggesting she was being treated for a psychiatric condition. Nor did she state on her application for benefits that a psychiatric condition was preventing her from working.

Ianniello further argues that she did not receive a full and fair review of her claim because Hartford never conducted an IME, relying instead on a paper review of her file. This argument must also fail as the Second Circuit has clearly stated that a plan administrator may elect not to conduct an IME if the claimant's medical evidence fails to establish that she is disabled. *See Hobson v. Metropolitan Life Ins. Co.,* 574 F.3d 75, 91 (2d Cir. 2009). Finally, Ianniello argues that Hartford should have afforded more weight to her treating physicians than it did to the doctors who performed the independent review. Again, this argument fails in that Hartford is not required to defer to the conclusions of Ianniello's treating physicians. *See Mood v. Prudential Ins. Co.*, 379 F. Supp. 2d 267, 281 (E.D.N.Y. 2005).

Hartford gave Ianniello a full and fair review of her claim and has presented to this court substantial evidence on which they relied in determining that Ianniello could perform sedentary work. Even when the court considers Hartford's conflict and Dr. Bress's possible lack of neutrality, it was not unreasonable for Hartford to conclude that Ianniello was not disabled based

on the lack of objective evidence. *See Hobson,* 574 F.3d at 88 (plan administrator may accord weight to objective evidence even if not specified in plan). Finally, as the court may not substitute its own judgment for that of the plan administrator, *see Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285-86 (1974), the undersigned finds that no reasonable trier of fact could determine that Hartford's denial was arbitrary or capricious and recommends that the defendant's motion for summary judgment be granted and the plaintiff's motion be denied.

## OBJECTIONS

A copy of this Report and Recommendation is being served by the Court on all parties. Any objections to this Report and Recommendation must be electronically filed with the Clerk of the Court within 14 days. Failure to file objections within this period waives the right to appeal the District Court's Order. *See* 28 U.S.C. §636 (b) (1); Fed. R. Civ. P. 72; *Beverly v. Walker,* 118 F.3d 900, 902 (2d Cir. 1997); *Savoie v. Merchants Bank,* 84 F.3d 52, 60 (2d Cir. 1996).

Dated: Central Islip, New York
August 16, 2011

_____/s/_____
Arlene R. Lindsay
United States Magistrate Judge